v. David Solorzano, and Vintage Healthcare Services, Inc., Appellee by Patrick Craig. Good morning, your honors, counsel. May it please the court. My name is Mike McCardle, and I am here today on behalf of the Plaintiff Appellants for the estate of Aaron White. This court should reverse the trial court's decision granting summary judgment in favor of the defendants on the basis that defendants did not owe a duty to White in the course of providing him services pursuant to his home services program. Reversal is appropriate here because the trial court failed to perform the appropriate duty analysis. Instead, the trial court made the factual determination of what particular acts the defendants were or were not required to do, which is a question of breach. The controlling case on this critical distinction between the issue of duty and breach is the Illinois Supreme Court's decision in Marshall v. Burger King. In Marshall, the plaintiff's decedent was killed when an out-of-control car crashed through the wall of a Burger King where he was eating. The plaintiff alleged that Burger King was negligent in failing to erect concrete barriers or failing to have the wall bricked up all the way as opposed to a half wall. The trial court granted Burger King's motion to dismiss with the trial court reasoning that requiring businesses to guard against injury in the manner suggested by the plaintiff would require fortifying every building within striking distance of crazed or inept drivers. The Illinois Supreme Court reversed, explaining that the trial court's reasoning conflated the issue of duty with the issue of breach. Marshall makes clear that whether a duty exists is distinct from whether a defendant's particular conduct breached that duty. There, the failure to erect barricades, which is a question of fact for the jury. Here, the trial court similarly made determinations of fact as to what particular actions defendants were or were not required to do. The trial court said that a defendant was required to cook or bathe or put Mr. White's shoes on, but not supervise him, just as the trial court did in Marshall. The appropriate inquiry on the issue of duty, the touchstone issue as some courts have called it, is whether the parties stood in such a relationship to one another that the law imposes upon the defendant the duty to exercise reasonable care for the benefit of the plaintiff. And whether a sufficient relationship exists requires weighing the foreseeability and likelihood of the injury against the magnitude and consequences of the burden placed on the defendant. The nature of the party's relationship with White being a participant in the Illinois Home Services Program and defendants being the vendor providing him with program services goes to the very heart of foreseeability and the likelihood of injury in this case. The defendants argue that the service plan, which they characterize as a contract, should be read in isolation, removed from the larger context of the program, how it functions, its purpose. But the service plan is not a traditional contract between two private parties with provisions and definitions, like the one that is seen in the Pescinelli case that the trial court relied on. Rather, it is a form that identifies White as a participant in the program and what level of services he qualifies for. But the service plan cannot reasonably be interpreted without understanding the program itself. The Home Services Program is administered by the Illinois Department of Human Services and its purpose is to prevent the unnecessary institutionalization of people who are in need of long-term care. The administrative code governs who can participate in the program and eligibility to participate is predicated upon what's called a DON, or a determination of needs assessment, that specifically considers the applicant's need for supervision and or assistance and whether without it there is a risk to the individual's health and safety. It is undisputed in this case that that is the context of White and defendant's relationship. So from the outset, White's relationship with defendants, which exists solely because of his participation in this program, is grounded in White's disability and need for aid. It is the very reason that Mr. Solorzano was with him at the pool that day. Given the very nature of the program, participants like White are at a foreseeable risk of and likely to sustain any variety of injuries if appropriate precautions are not taken. The appellate court in Stearns adopted this very same logic as it applied to nursing home residents. In Stearns, a nursing home resident died from injuries that she sustained while being transported back to the nursing home from a dialysis facility by a third-party medical transport company. The plaintiff alleged that the nursing home was directly negligent for not having someone accompany the resident and not instructing the driver about the risks that she faced. The trial court granted summary judgment, and on appeal, the court reversed, holding that the nursing home did owe the resident a duty. As to the foreseeability and likelihood of injury, the court reasoned that the nursing home residents are at a foreseeable risk of and likely to sustain any variety of injuries if appropriate precautions are not taken. That same logic applies here. Another important factor for foreseeability and likelihood of the injury is that the general character of the injury must be objectively reasonable to expect, given what the defendant knew or should have known at the time. So in addition to the relationship between the parties being predicated on this program, which is designed to keep disabled people from being institutionalized, there is evidence that the defendants, specifically Mr. Solorzano, had prior knowledge of White having seizures in pools before. He told the police on the day of the incident that White had numerous health issues, including epilepsy and seizures, and reported at least one prior incident of him having a seizure in a pool about the year prior. And then Mr. Solorzano, on the day of the incident, also called Mr. White's brother and told him that he and White had been through this more than a dozen times and described, at rescue reference, actually having to get in the pool and prop him up against the side and perform CPR on him. This only further demonstrates the foreseeability and likelihood of White's injury, where his caretaker, in essence, abandoned him in this pool. This recording you had with his brother, how was that presented at the trial, Judge? It was presented in the transcript of Mr. Solorzano's deposition. What I did was had it played. Right, you played it during the deposition as an admission. Were there objections to the trial judge considering this recording? I don't believe that there was certainly never any motion practice on a motion to strike or a bar. There was no objection when I played it at the deposition. I do not recall that there was an objection during the actual argument. Okay. Thank you. Yes, sir. The trial court also seemed to cast some blame on White himself for going in the pool with knowledge of his own health conditions and medical status, but apportioning blame is between the parties. That's an issue that is strictly for the jury. More importantly, even if White may share in the blame for his own drowning, that has no bearing on whether the defendants were required to exercise reasonable and ordinary care in providing their client with his home services program. The nature of the home service program is also highly relevant to the magnitude and consequences of the burden placed on the defendant. After all, they are in the business of providing program services to participants like White. Now, defendants don't argue that they shouldn't be required to exercise reasonable and ordinary care in providing program services. Instead, they argue they shouldn't be required to do or refrain from doing certain particular acts. But Marshall makes it clear that's not the appropriate analysis. It conflates duty and breach. The argument that defendants weren't required to supervise White is also contradicted by the evidence. Defendants' own records, daily sheets, which Mr. Solorzano described as what my duties are, show that defendants were routinely supervising White in the weeks and months prior to this drowning event. Supervision was a box that was checked over and over again to reflect services that were being provided to White. Put simply, defendants were in the business of providing program services to disabled people, and the finding that they owed a duty to exercise reasonable and ordinary care in providing those services is not some tremendous burden on the defendants. The trial court here failed to perform the appropriate duty analysis as required, warranting reversal. And even if the trial court had done the correct analysis, the facts of this case simply do not warrant summary judgment on the issue of duty. Now, in addition to the negligence theory, plaintiffs also allege that defendants voluntarily undertook White to supervise White in the pool. Mr. Solorzano was there in the pool area with him for several minutes that day before he left White unattended. He had accompanied White to the pool on numerous prior occasions, and Mr. Solorzano admitted to White's brother after the fact that he had actually had to rescue White on numerous prior occasions. Defendants' answers to these facts is an alleged conversation that occurred between White and Solorzano and was unwitnessed by anyone else, in which Solorzano claims he informed White that he was leaving. Now, first and foremost, this alleged conversation violates the Dead Man's Act. The primary purpose of the act is to remove the temptation of essentially fabricating conversations between an individual and the deceased to create a sort of get-out-of-jail-free card. Plaintiffs did not introduce evidence of this conversation, and without first opening the door, the act should have barred the conversation. The trial court in this case concluded that we had opened the door to this conversation because of, finally, a voluntary undertaking theory. But there is no case law supporting that conclusion, and the reliance element of the voluntary undertaking is based upon White's prior dealings with Mr. Solorzano, including the numerous instances in which Mr. Solorzano admitted to over the phone with White's brother, and his course of dealings that day, being he was at the pool with him, watching over him before he decided to leave. Second, even if the conversation was appropriately considered, there are questions of fact as to the voluntary undertaking that preclude summary judgment. We've spoken about the nature of the program, Mr. Solorzano's own admissions to police and White's brother about prior incidents, and defendants' own records showing that supervision was something that was routinely provided to White. And yet Solorzano, in the middle of his shift, can just press the pause button and walk out on his disabled client? It's important to note that these are not two strangers who have been both at the pool at the same time. Solorzano was there during his shift, providing services to a participant in this government program for disabled people. And he decided to simply walk away from his client. This is a professional relationship. Once Mr. Solorzano— I think he's on duty, doesn't he? Pardon? You're starting to slide into the negligence issue, I think. That's fair.  The point being, though, that once Mr. Solorzano, in the course of providing him program services, decides to bring him to this pool and watching over him, he's voluntarily undertaken, at the very least, to supervise White until he is safely back out of that pool. There is evidence that Mr. Solorzano had specific knowledge of White's previous incidents, had assisted him on those prior occasions, and on the negligent under-thinking theory, there is a question of material fact as to whether abandoning White in the pool, whether this conversation is considered or not, was reasonable under the circumstances. I see that I have additional time, but if the Court has any questions, I'd be glad to entertain them. Sure. Other than the testimony during the deposition, where Mr. Solorzano indicated to the brother of the decedent that he'd had to rescue him before, was there other evidence that he and the decedent had been at the pool on other occasions, other than that conversation? So, Solorzano himself testified that he would routinely bring White to the pool, and the responding officer, I forget if it's Rosario or Paulides, excuse me, but it's in the record, there was a report made by Solorzano on the day of the incident to one of the responding officers that he had had a similar incident with a seizure in a pool about a year prior. Thank you. Did you ever conduct any discovery regarding Lifetime Fitness, or trying to figure out what happened at Lifetime Fitness, that they were barred from there? I did receive some documents on it, but they're not part of the record on this case.  I apologize. I believe Mr. Solorzano, if you're looking for specifics that is in the record, I believe Mr. Solorzano testified about an incident where he, I think he had a seizure and it fell on a bath or in the shower area. I believe that was at the Lifetime. Any other questions? All right, I have none. For those reasons and those more fully discussed in our briefs, this court should reverse the trial court's grand summary judgment in favor of defendants and remand this case to proceed to trial on the merits. Thank you for your time and attention. Great. Thank you, counsel. Mr. Craig, did I say it correctly? Craig? Yeah. All right. You may proceed. Thank you. Thank you, Mr. Court. My name is Patrick Ray, representing Infant Child Care Services and Mr. David Solorzano. The circuit court's order granting summary judgment in favor of these defendants should be affirmed. Starting with contractual duty, Trent's argument for reversal is dependent upon this court setting aside the service plan agreed to by the parties, which outlined Solorzano's duties to Mr. White. But numerous courts have found that a defendant's duties will not be expanded beyond the scope of such a document. Trent largely ignores the contractual duty analysis on appeal, hoping to cast aside the express duties in that contract, and instead he focuses on the policy considerations behind the home services program. And he argues the mere fact that White qualified for home services meant that he had a disability for which constant supervision was required. But that is not what the parties agreed to here, and it is not what the Division of Rehabilitation Services thought was appropriate for White. What about the fact that he was in a pool and he was prone to having seizures? Would that require constant supervision, at least in a pool? Within the context of the contractual duty, because there's nothing within the contract that requires constant supervision, certainly in the alternative theories of duty that plaintiff forwards, that's their argument, for purposes of contractual duty, nothing within that states that there was a duty to supervise in the pool, given that this was a contract for homemaker services and specific tasks as to what applied net, cooking, cleaning, there was driving him around, chauffeuring him around. Those are part of the contract, but specifically constant supervision is not included. And affirmative evidence of that is that the contract included options such as adult daycare or exercise therapy. What about aside from the contract? Sure, so aside from the contract, it can start to be the common law duty analysis. I think the focus on Stearns and Marshall v. Burger King loses sight of the fact that in those cases, both of those courts found a affirmative duty arose from a relationship between the parties. In the case of Stearns, it was a custodian-war relationship with a nursing home resident, and with Marshall and Burger King, it was a business invitor to an invitee, a patron of the restaurant. And in those cases, the special relationship gave rise to an affirmative duty, where there's no such relationship in this case, such that we focus on just the four factors of the common law duty analysis. And so under that analysis as to how it applies here, to answer your question, there may have been some foreseeability and likelihood because of evidence in the record for purposes of summary judgment that Solorzano had knowledge of prior swimming incidents. But then we have to factor in the magnitude of the burden and consequences of the burden. Are you conceding foreseeability now? Not conceding foreseeability outright. I think it's a factor that needs to be part of the analysis if we're taking all facts in light of the non-movement. But also for purposes of foreseeability, this is an open and obvious swimming pool, which the Supreme Court has identified as an open and obvious danger. And Mr. White is more in tune with what's a danger to him, given his health conditions and his purported history of incidents in the pool more than anyone. There was no allegation that he was mentally incapacitated or wasn't able to ascertain what his capabilities were. And so for that duty to fall on Mr. Solorzano... Is it possible that when he made the conscious decision to go swimming, he did it believing that his caregiver would be there rather than outside? So I think that would get into the voluntary undertaking argument, which not to change gears on you here, but for purposes of voluntary undertaking, we would posit that Trent's argument for reliance is, well, I had incidents in the pool and you were there helping me a dozen or so times, according to that phone conversation, if we are to accept that for purposes of summary judgment. But whether or not the reliance is reasonable, we cited the Chisholm case in our briefs as an argument as to why that does not establish reasonable reliance in the context of voluntary undertaking. Just because Solorzano purportedly helped in prior instances without war is not evidence that he had any voluntary undertaking on the date of the occurrence. All we have from the record is that Solorzano may have entered the pool on the date of the occurrence, but accepting his affidavit that he filed, it was considered by the circuit court pursuant to the waiver of the Dead Man's Act, as well as Tricia Simms' The Witness in the Pools account, he had terminated his undertaking and had left the pool by the time the adverse medical event occurred. And the pure entry of the pool is not evidence of a voluntary undertaking in and of itself. Just to wrap up on the contractual duty, the main point I'll just argue here is that because Trent's arguing on the purposes of the plan, requiring some need to constantly supervise, the Division of Rehabilitation Services set up a service plan for Mr. White as someone who required a service plan, and they did not come to the conclusion that he required constant supervision. So to require Solorzano as a homemaker for him to expand his duties to include that. So let me, maybe I'm going to sum up what I think your argument is. So the contract does require Solorzano to supervise his client that he's getting paid to supervise. Other outside the home, shopping, drives, swimming. But you're saying because the contract doesn't use specifically the word constant, that there's no contractual duty here? I don't think that's exactly the argument. The contract does include cooking because he can't be alone. He drives him to places. Supervision is not in the contract whatsoever. So I would disagree with that being an argument that he has to be with them while swimming. There's nothing about supervision. There's nothing about any forms of exercise that he has to be there for. As the circuit court pointed out at the hearing on the summary judgment motion, he has to take him shopping. There's no requirement that he's with them every step of the way, within every aisle of the grocery store to supervise them. He's there to help carry his groceries. He's there to help. But they use the word supervision in the rest of the paperwork. If he's driving you somewhere because the man can't drive, it is arguable that he's supervising him. If he can't shop, he can't reach items, he can't get out of a wheelchair, and he has to take him grocery shopping or clothes shopping, he's supervising him. So it just seems to me you're hinging on this word constant. What does that mean? Does constant mean he can't take his eyes off him all day, every day? One would argue, no. You could take that position, no. But when he knows he's seizure prone and he's in a pool, can he take his eyes off him? Is that what constant means? I'm saying if there's eight hours in a day and he's supervising through various tasks, some of them he could take his eyes off him. If he's in his wheelchair in an aisle, I'm going to run around to the other aisle and I think the pickles are on this side, and maybe there's very little. So you don't have to constantly supervise him. But when he's in a pool and you know he's had seizures and you've had to save his life before, then maybe for that hour that he's in the pool, you do need to constantly. In essence, what I'm saying is it seems like you're using a word in its context just to say it's not a contract. When all the acts in the other language would lead one to believe it is in the contract. He's a supervisor. Every minute of eight hours a day, maybe not. But for the half hour or hour or 20 minutes the guy's in a pool, do you need to constantly supervise? I guess that's for down the line. But it seems like we're getting hung up on the word constant, and I don't even know if it has a full definition or meaning in this context. Your Honor, I think supervision is not in the contract whatsoever. I'm not being hung up on constant. I'm being hung up on supervision being required by the contract whatsoever. Mr. White lived alone. Mr. Solorzano would come to his house between five to six hours a day to help with these activities of daily living. He was not determined by the Division of Rehabilitation Services to be a patient that required supervision whatsoever. The adult daycare was an option that could have been provided for him. The Division of Rehabilitation Services didn't think that was appropriate for him. I think Trent has cited the daily check-in sheets where the supervision box is checked, meaning that was an activity he performed on that date. But as to setting out what Solorzano's duties are pursuant to the Division of Rehabilitation Services plan, supervision is nowhere to be found. This is an individual who lived alone. Mr. White did not require supervision to go about his daily life. Mr. Solorzano was there to help him with things he couldn't do due to his weight, due to his back and knee conditions, or hip conditions, sorry. And that included things like driving and carrying groceries. Mr. Craig, how long did this relationship of caregiver and individual last? So the incident was in August 2020. Solorzano started taking him to the pool around 2017. And the relationship started sometime prior, I think about a year, is when he started taking him to the pool. So that relationship would have lasted between approximately 2016 and then August 2020 on the date of the occurrence. At any time during that four-year period, was there a change in the responsibilities that Mr. Solorzano was required to provide? It doesn't appear so from the record other than the swimming. It started off in the beginning where, according to Solorzano's deposition testimony, that it had always been the case that Mr. Trent and Mr. White wanted any caretaker. He had caretakers prior to Mr. Solorzano. They wanted their caretakers to take him to the pool. And prior caretakers to Solorzano did not do that. That was not required by the Division of Rehabilitation Services, and no one that was with him was supposed to do that. No, my question was not that. It was whether there was a deterioration in Mr. White's condition over the four years that Mr. Solorzano was caring for him. From review of the record, it does not appear that his condition had deteriorated such that there was change in what Solorzano was performing for him. No additional duties were taken on other than going to the pool? It appears so from the record, Your Honor. Thank you. Just to finish up on the constant supervision, I think that besides that box being checked on the daily sign-in sheets, there's no evidence that supervision is required of this individual whatsoever. So that is an additional duty being added to Solorzano that was not contracted for, and that's where we get into the—since it's not in the contract, to get to the common duty analysis, common law duty analysis, that is a significant burden for home service providers who contract individuals to not provide any supervision and instead perform daily homemaker tasks, to then expect them to go above and beyond and supervise and be responsible in instances like that where the Division of Rehabilitation Services does not call for the homemaker service providers to do that is why a common law duty should not be imposed. And even more so— And he did that, right, like a dozen times or more. He did go above and beyond what you're saying that he had to do. We know from the phone call, except for his fact or summary judgment, that he had intervened a dozen or so times. We have no idea what those interventions entailed. There's no evidence as to what efforts he undertook or what he got in the pool on the date of the occurrence. So maybe he'd gotten in the pool on prior occasions. But to prescribe a duty to him, since it's not a part of the contract, we leave that alone. For purposes of voluntary undertaking, I don't think entering a pool on the date of the occurrence is a voluntary undertaking just based off the fact that it happened a dozen or so times before. Maybe not entering the pool, but at least being near the pool, and then entering the pool if an emergency situation arises. Well, he had been taken into the pool starting in 2017, most days until the date of the occurrence in August 2020, which is a lot of trips to the pool, several hundred, and this had only happened a dozen or so times. How many times does it have to happen before it becomes foreseeable? Well, for purposes of the common law duty analysis, that's an element to consider for foreseeability. But this is also individual. How many times does he have to save him from the pool before it becomes a duty that he's already taken on? Well, for purposes of voluntary undertaking, I think the relevant analysis is whether or not he had done any undertaking, so on prior occasions, that's evidence to consider. But the Chisholm case stated, just because there are prior instances of intervening and helping, that alone does not establish a reasonable reliance on voluntary undertaking on the date of the occurrence. So I don't know the answer to your question as to how many times it needs to happen, but according to Chisholm, prior instances alone are not enough to establish a reasonable reliance on a voluntary undertaking, irrespective of what the answer to that question is. Given all the other contexts in this case, he was a homemaker services, no requirement to perform this duty in the first place. So according to Chisholm, at least, I don't think the answer to that question bears any weight on whether or not there was a voluntary undertaking because it cannot show reasonable reliance. Would you agree that being in the room would be different than being outside the pool? Being in the area to be able to observe his client versus leaving the building, is there a difference in terms of his obligations? As to whether or not he has voluntarily undertaken any additional duty beyond the contract? Yes. I don't think any, I don't think there's a difference, I don't think either of those actions makes a difference as to whether or not he's voluntarily undertaken. I don't think even being in the room is evidence alone of any voluntary undertaking to supervise. Certainly, if there was a different swimmer in the pool, that swimmer wouldn't have any duty to save the other person in the pool. So purely because Mr. Solorzano may have notice of prior incidents and being in the pool is still not enough, at least according to Chisholm, of being enough to establish a voluntary undertaking, even just being in the area. Thank you. Sure. We've covered everything I wanted to. I just want to state that while Trent relies on Stearns and Marshall versus Burger King, I just want to again establish that those were cases where the courts found a special relationship existed giving rise to an affirmative duty. We argue that Lancer versus Senior is a more instructive case because that was a case where the duty sought to be established was intimate and constant surveillance, which is sought to be assumed here, and that was a case where there was no special relationship. So the appropriate magnitude and burden analysis would be applied from that case to find that there was no common law duty, and we would ask that the court affirm some of the judgment. All right, thank you. Any other questions? No. Okay. Thank you, Mr. Craig. Mr. McCardle, you have five minutes and rebuttal. Thank you, Your Honor. I just have a couple quick points, Your Honor. With regard to the defendant's contention that Marshall and Stearns involve special relationships, in Marshall there was a special relationship of a business invitee. The court, the Illinois Supreme Court, specifically said that does not end our inquiry. We have to do the balancing of the foreseeability and likelihood of the injury and the magnitude and consequences on the defendant, something that the trial court just simply didn't do in this case. Stearns said it was arguably a custodial war relationship, but also did the balancing analysis and said it would be appropriate to impose a duty on either basis. With regard to the contention that the program has nothing to do with supervision, the way eligibility for this program works is they have to do, the department does what's called a determination of needs assessment, and it takes a look at various activities of daily living and determines whether there is some, a great deal, or constant need for supervision and or assistance, and then whether in the absence of that there is a risk, moderate risk, or extreme risk. I have that citation for you. It's also in the briefs if you'd like it. So this program very much has to do with supervision. Regarding the reliance on the Chisholm case, regarding the voluntary undertaking, that is a case of where an elderly lady falls as she's exiting, I think it was an apartment, because the gentleman had not taken care of the snow and ice. That's a case of nonfeasance. I think this case is more appropriately viewed as one of misfeasance, meaning that Solorzano had undertaken this duty and then was negligent in the performance of it. In my view, it's that he undertook supervising him while he's in the pool area, watching over him, and then leaving him, not just leaving the pool area, but leaving the building. And then finally, the defendants brought up the Lance case. That's the case where the minor swallowed a needle while he's over at a friend's house. This case is pretty easily distinguishable from that. This is not some family letting some neighbor kid come over. This is a professional relationship that White had with this company and with this individual who's supposed to be taking care of him. Unless your honors have any questions. I don't have any. No. No, thank you. All right. Thank you, both of you counsel, for your arguments. We will take this case under advisement and issue a decision in due course.